BRYANT, Judge.
*666 Where the trial court complied with the statutory requirements in determining that life imprisonment without parole was warranted for defendant, we hold the sentence is not in violation of the Eighth Amendment. Where the trial court properly made ultimate findings of fact on each of the Miller factors as set forth in section 15A-1340.19B(c), we hold that the trial court did not abuse its discretion in weighing those factors and concluding that life imprisonment without parole was appropriate in defendant's case.
In the instant case, the trial court incorporated the facts as articulated by this Court in State v. Sims , 161 N.C. App. 183, 184-189, 588 S.E.2d 55, 57-60 (2003), into its order from which defendant appeals.[1] The facts are as follows:
[D]efendant [Antwaun Sims, who was seventeen at the time of the offense,] was with Chad Williams ... and Chris Bell ... in Newton Grove, North Carolina on 3 January 2000, when Bell said that the group needed to rob someone to get a car so Bell could leave the state to avoid a probation violation hearing. Defendant agreed to assist Bell. Defendant, Bell, and Williams observed Elleze Kennedy (Ms. Kennedy), an eighty-nine-year old woman, leaving the Hardee's restaurant ... around 7:00 p.m. Ms. Kennedy got into her Cadillac and drove to her home a few blocks away. Defendant, Bell, and Williams ran after Ms. Kennedy's car ... until they reached [her] home. Bell approached Ms. Kennedy in her driveway with a BB pistol and demanded *404 Ms. Kennedy's keys. Ms. Kennedy began *667 yelling and Bell hit her in the face with the pistol, knocking her to the ground. Bell told defendant and Williams to help him find the keys to Ms. Kennedy's Cadillac. After rifling through Ms. Kennedy's pockets, Williams found the keys on the carport and handed them to defendant who agreed to drive.
Bell told defendant and Williams to move Ms. Kennedy to the back seat of the Cadillac.... Ms. Kennedy kept asking Bell where he was taking her. Bell responded by telling her to shut up and striking her in the face several times with the pistol....
After driving, ... defendant, Bell, and Williams put Ms. Kennedy, who was unconscious at the time, in the trunk of the Cadillac....
....
[Later], Williams told defendant and Bell that he was not going to travel in a stolen car to Florida with an abducted woman in the trunk....
....
Williams asked if they could let her go, but Bell replied, "Man, I ain't trying to leave no witnesses. This lady done seen my face. I ain't trying to leave no witnesses." Bell asked defendant for a lighter to burn Bell's blood-covered jacket. Defendant gave Bell his lighter and Bell set the jacket on fire and threw it into the Cadillac. Bell stayed to watch the fire, but defendant and Williams walked ... to defendant's brother's house to watch television.... The next morning Bell told defendant to go back to the car and confirm that Ms. Kennedy was dead, and that if she was not, defendant should finish burning the Cadillac. Defendant returned and told Bell and Williams that Ms. Kennedy was dead and that all of the windows in the Cadillac were smoked....
....
Ms. Kennedy's Cadillac was found by law enforcement the morning after her abduction. Investigators discovered Ms. Kennedy's body in the trunk. They made castings of footprints found in the area of the abandoned Cadillac. The castings were later compared to, and matched, shoes *668 taken from defendant.... Investigators recovered a red cloth from the backseat floorboard, which was later identified as the one defendant had used to wipe down the backseat of the Cadillac. Tests of the cloth showed traces of defendant's semen and Ms. Kennedy's blood. Police found two hairs in the backseat area of the Cadillac, one of which was later determined to be defendant's and the other Bell's. Police also matched latent fingerprints found on the Cadillac with prints taken from defendant and Bell.
....
Forensic pathologist Dr. Falpy Carl Barr (Dr. Barr) testified that he conducted Ms. Kennedy's autopsy on 5 January 2000.... Dr. Barr testified that Ms. Kennedy was struck multiple times with a weapon, leaving marks consistent with a pellet gun.... Dr. Barr testified that because of the extent of the soot in her trachea and lungs he believed that she was alive and breathing at the time the fire took place in the vehicle; however, because of Ms. Kennedy's elevated carbon monoxide level, Dr. Barr came to the conclusion that Ms. Kennedy died as a result of carbon monoxide poisoning from a fire in the Cadillac.
Id.
Defendant was arrested and later indicted for first-degree murder, assault with a deadly weapon inflicting serious injury, first-degree kidnapping, and burning personal property. On 14 August 2001, defendant was tried capitally in the Criminal Session of Onslow County Superior Court, the Honorable Jay Hockenbury, Judge presiding.[2] Defendant was convicted of first-degree murder, first-degree kidnapping, and burning of personal *405 property. At his sentencing hearing, the jury unanimously recommended that defendant be sentenced to life imprisonment without parole, as opposed to death, and the trial court entered judgment. Defendant appealed to this Court, which found no error in defendant's conviction. *669 On 4 April 2013, defendant filed a motion for appropriate relief requesting a new sentencing hearing in light of the United States Supreme Court's decision in Miller v. Alabama , 567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012), which held that mandatory life without parole for juvenile offenders violates the Eighth Amendment's prohibition of cruel and unusual punishment. By order entered 2 July 2013, the trial court granted defendant's motion for appropriate relief and ordered a rehearing pursuant to Miller as well as our North Carolina General Assembly's enactment of N.C. Gen. Stat. § 15A-1340.19B, 2012 N.C. Sess. Laws 2012-148, § 1, eff. July 12, 2012 (stating that a defendant who is less than eighteen years of age who is convicted of first-degree murder pursuant to premeditation and deliberation shall have a hearing to determine whether the defendant should be sentenced to life imprisonment without parole or life imprisonment with parole).
On 20 February 2014, the Honorable Jack Jenkins, Special Superior Court Judge, conducted a hearing and ordered that "defendant's sentence is to remain life without parole." Defendant appealed. On 28 September 2016, this Court issued a writ of certiorari for the purpose of reviewing the resentencing order.
On appeal, defendant contends the trial court (I) violated his Eighth Amendment constitutional protection against cruel and unusual punishment by imposing a sentence of life without parole; and (II) erred by imposing a sentence of life without parole because the trial court failed to make findings on the presence or absence of Miller factors and the findings it did make do not support the conclusion that the sentence was warranted.
I
Defendant first argues the trial court violated his constitutional protections against cruel and unusual punishment by imposing a sentence of life without parole. We disagree.
"The standard of review for alleged violations of constitutional rights is de novo ." State v. Graham , 200 N.C. App. 204, 214, 683 S.E.2d 437, 444 (2009). The prohibition of cruel and unusual punishment under the Eighth Amendment forbids entering sentences "that are grossly disproportionate to the crime." State v. Thomsen , 242 N.C. App. 475, 487, 776 S.E.2d 41, 49 (2015), aff'd, 369 N.C. 22, 789 S.E.2d 639 (2016) (quoting Harmelin v. Michigan , 501 U.S. 957, 959, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) ). The jurisprudence of the Eighth Amendment as it applies to *670 juveniles recognizes that juvenile offenders are categorically distinguishable from adult offenders because of their "diminished culpability and greater prospects for reform." Miller , 567 U.S. at 471, 132 S.Ct. at 2464, 183 L.Ed.2d at 418. Nevertheless, courts continue to balance their interests in enforcing suitable punishments for juveniles proportionate to the crime while also maintaining fairness to juvenile offenders.
Miller v. Alabama "drew a line between children whose crimes reflect[ed] transient immaturity and those rare children whose crimes reflect[ed] irreparable corruption." Montgomery v. Louisiana , 577 U.S. ----, ----, 136 S.Ct. 718, 734, 193 L.Ed.2d 599, 620 (2016), (as revised Jan. 27, 2016). The United States Supreme Court ruled that imposing a mandatory life sentence without the possibility of parole for juvenile offenders violates the Eighth Amendment and "a judge or jury must have the opportunity to consider mitigating circumstances." Miller , 567 U.S. at 489, 132 S.Ct. at 2475, 183 L.Ed.2d at 430 ; also see id. at 476, 132 S.Ct. at 2467, 183 L.Ed.2d at 422 ("Such mandatory penalties, by their nature, preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it.")
In response to Miller (but prior to the U.S. Supreme Court's decision in Montgomery in 2016), our General Assembly enacted N.C. Gen. Stat. §§ 15A-1476 et seq. -now codified *406 as 15A-1340.19 et seq. Section 15A-1340.19B(a)(1) provides that if a defendant is convicted of first-degree murder solely on the basis of the felony murder rule, his sentence shall be life imprisonment with parole. N.C.G.S. § 15A-1340.19B(a)(1) (2017). If a defendant is not sentenced pursuant to subsection (a)(1), "the court shall conduct a hearing to determine whether the defendant should be sentenced to life imprisonment without parole, as set forth in G.S. 14-17, or a lesser sentence of life imprisonment with parole." N.C.G.S. § 15A-1340.19B(a)(2) (2017). Section 15A-1340.19C requires the sentencing court to consider mitigating factors in determining whether a defendant will be sentenced to life without the possibility of parole or life with the possibility of parole and to include in its order "findings on the absence or presence of any mitigating factors...." N.C.G.S. § 15A-1340.19C(a) (2017). Therefore, the statutory scheme does not allow for mandatory sentences of life without parole for juvenile offenders and, thus, on its face, is not in violation of the Eighth Amendment per Miller .[3] *671 Nevertheless, defendant contends the evidence establishes that he is not one of the rare juveniles who is "permanent[ly] incorrigib[le]" or "irreparabl[y] corrupt[ ]" and warrants a life sentence without parole as noted in Montgomery . Instead, defendant insists that the evidence indicates that at the time of the murder, his intellectual difficulties, developmental challenges, susceptibility to peer pressure, and potential for rehabilitation support a sentence of life in prison with the possibility of parole. Based on the foregoing reasons, and the analysis which follows, we overrule defendant's Eighth Amendment argument. We review the trial court's balancing of the Miller factors in Issue II.
II
Defendant next argues the trial court erred by imposing a sentence of life without parole because the trial court failed to make findings on the presence or absence of Miller factors and the findings it did make were either contradicted by the evidence or did not support the conclusion that the sentence was warranted. Specifically, defendant challenges six out of the court's nine findings of fact alleging flawed reasoning, and further argues that the trial court failed to establish which factors were mitigating. We disagree.
When an order entered pursuant to N.C.G.S. § 15A-1340.19A et seq . is appealed, this Court reviews "each challenged finding of fact to see if it is supported by competent evidence and, if so, such findings of fact are 'conclusive on appeal.' " State v. Lovette , 233 N.C. App. 706, 717, 758 S.E.2d 399, 407 (2014). The trial court's weighing of mitigating factors to determine the appropriate length of the sentence is reviewed for an abuse of discretion. State v. Antone, 240 N.C. App. 408, 410, 770 S.E.2d 128, 129 (2015). "It is not the role of an appellate court to substitute its judgment for that of the sentencing judge." Lovette , 233 N.C. App. at 721, 758 S.E.2d at 410.
Our General Statutes, section 15A-1340.19B(c) sets forth factors a defendant may submit in consideration for a lesser sentence of life with parole. Those factors include: "1) age at the time of offense, 2) immaturity, 3) ability to appreciate the risks and consequences of the conduct, 4) intellectual capacity, 5) prior record, 6) mental health, 7) familial or peer pressure exerted upon the defendant, 8) likelihood that the defendant *672 would benefit from rehabilitation in confinement, and 9) any other mitigating factor or circumstance." N.C.G.S. § 15A-1340.19B(c). We refer to these as the Miller factors.
Here, defendant argues the trial court did not establish which factors were mitigating and imposed a sentence that was not supported *407 by the evidence. The State, on the other hand, asserts the trial court made evidentiary findings on the presence or absence of Miller factors, and made explicit (or ultimate findings) on whether it found the factors to be mitigating. The trial court's evidentiary findings of fact (which defendant does not challenge and are therefore binding on appeal, see In re Schiphof , 192 N.C. App. 696, 700, 666 S.E.2d 497, 500 (2008) ) are, in relevant part, as follows:
1. The Court finds as the facts of the murder the facts as stated in State v. Sims , 161 N.C. App. 183[, 588 S.E.2d 55] (2003).
2. The Court finds that the murder in this case was a brutal murder. The Court finds instructive the trial/sentencing jury's finding beyond a reasonable doubt that the murder was "especially heinous, atrocious, or cruel" pursuant to N.C.G.S. 15A-2000(e)(9). According to the trial testimony from Dr. Carl Barr, Ms. Kennedy had blunt force trauma all over her body.... Soot had penetrated deep into her lungs, meaning that she was alive when her car was set on fire with her in it, and she therefore died from suffocation from carbon monoxide poisoning.
3. The Court finds that the defendant has not been a model prisoner while in prison. His prison records indicate that he has committed and been found responsible for well over 20 infractions since he has been in prison.
4. The Court finds that the defendant, although expressing remorse during the hearing, has not demonstrated remorse based on his actions and statements. During a meeting with a prison psychiatrist on January 20, 2009, the defendant complained that he was in prison and should not be....
5. The Court finds that Dr. Tom Harbin testified that the defendant knew right from wrong. Further, Dr. Harbin testified that the defendant would have known that the *673 acts constituting the kidnapping [and the] murder were clearly wrong.
6. The Court finds that Dr. Harbin testified that the defendant was a follower, and was easily influenced. Dr. Harbin testified that the defendant may not see himself as responsible for an act if he himself did not actually perform the act even if he helped in the performance of the act. Further, Dr. Harbin testified that the defendant has a harder time paying attention than others and a harder time restraining himself than others. Dr. Harbin testified that the defendant had poor social skills, very poor judgment, would be easily distracted and would be less focused than others. Further, the defendant has a hard time interacting with others and finds it harder to engage others and predict what others might do.
7. The Court finds that while this evidence was presented by the defendant to try to mitigate his actions on the night Ms. Kennedy was murdered, that this evidence also demonstrates that the defendant is dangerous. Dr. Harbin acknowledge [sic] on cross-examination that all of the mental health issues he identified in the defendant, taken as a whole, could make him dangerous.
8. The Court finds that the defendant was an instrumental part of Ms. Kennedy's murder. She died from carbon monoxide poisoning from inhaling carbon monoxide while in the trunk of her car when her car was on fire. According to witness testimony at the trial, the defendant provided the lighter that Chris Bell used to light the jacket on fire that was thrown in Ms. Kennedy's car and eventually caused her death.
9. The Court finds that the evidence at trial clearly demonstrated that the defendant did numerous things to try to hide or destroy the evidence that would point to the defendant's guilt. The most obvious part is his participation in killing Ms. Kennedy, the ultimate piece of evidence against the defendants. Additionally, this defendant was the one who drove the car to its isolated last resting place in an attempt to hide it, even asking his codefendants if he had hidden it well enough. Further, he personally went back *674 to the car the morning after the night it was set on fire to make sure Ms. Kennedy was dead. *408 10. The Court finds that the physical evidence demonstrated not only his guilt, but specifically demonstrated the integral role the defendant played in Ms. Kennedy's death. Fingerprints, DNA, and footwear impressions at the scene where Ms. Kennedy was burned alive in her car all matched the defendant. Most notably, Ms. Kennedy died in the trunk of her car, and the palmprint on the trunk of the car, the only print found on the trunk, matched the defendant.
With regard to the trial court's ultimate findings of fact on each of the nine Miller factors, defendant challenges all but one (Finding of Fact No. 9) for either failing to establish which factors were mitigating, or as contradicted by the evidence or not supporting the conclusion that a sentence of life without parole was warranted. We address defendant's challenge to each ultimate finding in turn.
A. Finding of Fact No. 1-Age
1. Age. The Court finds that the defendant was 17 and ½ at the time of this murder, and therefore his age is less of a mitigating factor that [sic] it would be were he not so close to the age of criminal responsibility. Further, considering Miller v. Alabama to be instructive as to this factor, the Court notes that the two defendants in Miller, Jackson and Miller, were 14 at the time that each committed the murder for which he was convicted. Defendant Jackson was convicted solely on a felony murder theory and his initial role in the murder was as a getaway driver, and he was not the one who shot the victim. Defendant Miller had a very troubled childhood which included time in foster care and multiple suicide attempts. Miller killed a drug dealer that apparently provided drugs to Miller's mother and the killing occurred after a physical altercation with the victim. The Court finds that the defendant's age is not a considerable mitigating factor in this case .
(emphasis added).
Defendant challenges Finding of Fact No. 1 based on the assertion that "despite his chronological age, [defendant] was actually much younger in other respects on the offense date for this case."
*675 First, it is undisputed that defendant was seventeen-and-a-half years old when he and his two codefendants murdered Ms. Kennedy. Second, there is no indication that the legislature, in enacting N.C.G.S. § 15A-1340.19C(a), intended for the trial court to consider anything other than a defendant's chronological age with regard to this factor. Indeed, the trial court is to consider whether a defendant's age is a mitigating circumstance in light of all the circumstances of the offense and the particular circumstances of the defendant. See id. In the instant case, the trial court made a point of drawing a comparison between the ages of the defendants in Miller , who were fourteen years old at the time of their crimes, and defendant in this case, who was six months away from reaching the age of majority. In so doing, the trial court properly found that age was not a considerable mitigating factor in this case.
B. Finding of Fact No. 2-Immaturity
2. Immaturity. The Court does not find this factor to be a significant mitigating factor in this case based on all the evidence presented . The Court notes that any juvenile by definition is going to be immature, but that there was no evidence of any specific immaturity that mitigates the defendant's conduct in this case.
(emphasis added).
Defendant contends this finding is not supported by the evidence because the trial court ignored testimony from Dr. Harbin that defendant and his brother frequently had no adult supervision and raised themselves, defendant was "poorly developed," defendant's stress tolerance and coping skills were immature, and defendant had the psychological maturity of an eight to ten year old.
Contrary to defendant's assertions, the trial court made two evidentiary findings of fact-Nos. 6 and 7-which clearly show that it considered Dr. Harbin's testimony. As stated previously, defendant has not challenged the evidentiary findings of fact and so they are binding on appeal. See *409 In re Schiphof , 192 N.C. App. at 700, 666 S.E.2d at 500. Instead of finding that any evidence of immaturity mitigated defendant's actions, the trial court weighed the evidence and found more compelling Dr. Harbin's acknowledgment that certain characteristics-defendant's "poor social skills, very poor judgment," and difficulty "interacting with others and find[ing] it harder to engage others and predict what they might do"-"could make [defendant] dangerous." It is well within the trial court's discretion to "pass upon the credibility of [certain] evidence and to decide what[, or how much,] weight to assign to it." *676 State v. Villeda , 165 N.C. App. 431, 438, 599 S.E.2d 62, 66 (2004). Accordingly, defendant's argument that Finding of Fact No. 2 is not supported by the evidence is overruled.
C. Finding of Fact No. 3-Ability to appreciate the risks of the conduct
3. Ability to appreciate the risks of the conduct. Dr. Harbin, the defendant's psychologist, testified that in spite of the defendant's diagnoses and mental health issues, the defendant would have known that the acts he and his codefendants committed while they stole Ms. Kennedy's car, kidnapped her, and ultimately murdered her were wrong.
Defendant contends the trial court misapprehended the nature of this finding under section 15A-1340.19B(c)(3) because the question of whether defendant knew an act was wrong is part of the test for the defense of insanity.
In the trial court's unchallenged evidentiary Findings of Fact Nos. 5 and 9, the trial court found that defendant knew right from wrong as evidenced by the fact that defendant did numerous acts to attempt to hide or destroy evidence which would inculpate him in the killing of Ms. Kennedy, including the act of her murder itself, driving the vehicle to its last resting place, asking his codefendants if he hid the vehicle well enough, and personally checking to confirm that Ms. Kennedy was dead. By arguing that Dr. Harbin testified that defendant's intellectual abilities were deficient and that he had poor judgment, defendant essentially requests that this Court reweigh the evidence which the trial court was not required to find compelling. See State v. Golphin , 352 N.C. 364, 484, 533 S.E.2d 168, 245 (2000) ("The evidence presented by [the defendant's] mental health expert was not so manifestly credible that ... [the fact finder] was required to find it convincing."). Accordingly, the trial court did not misapprehend the nature of the factor in section 15A-1340.19B(c)(3) on whether defendant had the ability to appreciate the risks or consequences of his conduct, and this argument is overruled.
D. Finding of Fact No. 4-Intellectual Capacity
4. Intellectual Capacity. The Court finds that the defendant's intellectual capacity was below normal. Nevertheless, the Court finds that at the time of Ms. Kennedy's murder, the defendant was able to drive a car, to work at Hardee's, to be sophisticated enough to try to hide evidence in multiple ways at multiple places, and to work *677 with his co-defendants to hide evidence and to try to hide Ms. Kennedy's car so it would not be found.
Defendant challenges this finding as "violat[ing] the statutory mandate requiring findings of the absence or presence of mitigating factors." However, the trial court's use of the word "nevertheless" demonstrates that it did not consider this factor to be a mitigating one. In other words, Finding of Fact No. 4 can be read to say that while defendant's intellectual capacity was below normal, it was not a mitigating factor in light of other evidence (defendant's ability to drive a car, work at Hardee's, etc.). As such, this finding does not "violate the statutory mandate," and this argument is overruled.
E. Finding of Fact No. 5-Prior Record
5. Prior Record. The defendant's formal criminal record as found on the defendant's prior record level worksheet was for possession of drug paraphernalia. However, the Court notes that because the defendant was 17 ½, he had only been an adult for criminal purposes in North Carolina courts for a short period of time. The Court considers the defendant's Armed Robbery juvenile situation in Florida and *410 the defendant's removal from high school for stealing as probative evidence in this case, specifically because both occurrences occurred when the defendant was with others, and the defendant denied culpability in Ms. Kennedy's murder and the other two incidents. The Court does not find this to be a compelling mitigating factor for the defendant .
(emphasis added).
Defendant argues the trial court misapprehended this factor because it considered an armed robbery charge from Florida and defendant's expulsion from high school for stealing. He contends this mitigating factor only encompasses a defendant's formal criminal record, which showed a single conviction for possession of drug paraphernalia.
First, the statute at issue, N.C.G.S. § 15A-1340.19B, does not define the term "prior record." See id. § 15A-1340.19B(c). Second, in its unchallenged evidentiary Finding of Fact No. 4, the trial court found, in relevant part, as follows with regard to defendant's prior record:
[T]he Court reviewed materials and heard evidence that as a juvenile in Florida, the defendant had been charged with armed robbery but denied any culpability in the case. Also, *678 this Court heard and reviewed evidence that the defendant was removed from Hobbton High School in September 1998 in large part due to bad behavior. Specifically, the Court notes that the defendant was accused, along with two others, of stealing from the boy's locker room after school as a part of a group, but again denied doing anything wrong. The school specifically found that [defendant's] acts during this theft were not due to his learning disabilities. This Court notes in all three incidents, the Florida armed robbery, the Hobbton high school theft, and the murder of Ms. Kennedy, the defendant was with a group of people, and in the light most favorable to him, was at a minimum a criminally culpable member of the group but was unwilling to admit to any personal wrongdoing.
(footnote omitted). Further, in a footnote to unchallenged evidentiary Finding of Fact No. 4, the trial court stated as follows:
According to the defendant's evidence, the defendant was charged in juvenile court in Florida and was placed on juvenile probation as a result of this incident. Further, the defendant's version of this incident is that after being placed on probation, the charges were eventually dismissed. This Court does not specifically consider the charge itself or the subsequent punishment itself as evidence against the defendant, but rather finds noteworthy the defendant's complete denial of any wrongdoing while involved in criminal activity as part of a group. The Court notes the similarity to that incident and this incident, in which the defendant, while part of a group, committed acts that a Court deemed worthy of punishment, but for which the defendant denied wrongdoing.
By making clear that it was not "specifically consider[ing] the charge itself," the trial court nevertheless did not misapprehend the nature of this mitigating factor as there is no prohibition, statutory or otherwise, on a trial court taking into consideration school records which indicate a defendant has previously engaged in criminal activity simply because such evidence is not a part of a defendant's "formal criminal record." Indeed, evidence of defendant's conviction for possession of drug paraphernalia, followed by theft, followed by the murder of Ms. Kennedy shows the escalation of defendant's criminal activity, which is an appropriate consideration for the trial court. See Lovette , 233 N.C. App. at 722, 758 S.E.2d at 410 (finding no error in the trial court's conclusion *679 to sentence the defendant to life imprisonment without parole where, inter alia , the defendant's "criminal activity had continued to escalate"). Defendant's argument is overruled.
F. Finding of Fact No. 6-Mental Health
6. Mental Health. Dr. Harbin testified both at trial and at the February 20, 2014 evidentiary hearing that he diagnosed the defendant with ADHD and a Personality Disorder Not Otherwise Specified. The Court finds that although the defendant did have mental health issues around the time of the murder, they do not rise to the level to provide much mitigation . Many people have *411 ADHD, and a non-specified personality disorder is not an unusual diagnosis. Many people function fine in society with these issues.
(emphasis added).
Defendant challenges this finding as failing to provide a clear indication of whether it was mitigating or not, depriving this Court of the ability to effectively review the sentencing order. Contrary to defendant's assertion, the trial court clearly stated in Finding of Fact No. 6 that it found "that although the defendant did have mental health issues around the time of the murder, they do not rise to the level to provide much mitigation." In other words, the trial court did not find defendant's mental health at the time to be a mitigating factor. Defendant's argument is overruled.
G. Finding of Fact No. 7-Familiar or Peer Pressure exerted on the defendant
7. Familiar of Peer Pressure exerted on the defendant.
A. The Court finds there was no familial pressure exerted on the defendant to commit this crime. In fact, the opposite is true. Sophia Strickland, [defendant's] mother, testified both at the trial and at the February 20, 2014 evidentiary hearing that she had warned [defendant] repeatedly to stay away from the codefendant's [sic] in this case. Specifically, Ms. Strickland stated at the evidentiary hearing that if [defendant] continued to hang out with his co-defendants, something bad was going to happen. Further, [defendant's] sister, Tashia Strickland, also told [defendant] that she did not like the co-defendants, that the co-defendants were not *680 welcome at her residence, and that [defendant] should not hang out with them. Also, Vicki Krch, [defendant's] Hardee's manager, who tried to help [defendant] when she could, sometimes gave [defendant] a free ride to work, bought [defendant] a coat, and fed [defendant's] younger brother for free, warned [defendant] not to hang out with the co-defendants, one of whom had worked for her and she knew well. The Court finds that the defendant refused to listen to his family members' warnings to stay away from the co-defendants.
B. Peer Pressure. There was no evidence in this case that [defendant] was threatened or coerced to do any of the things he did during the kidnapping, assault, murder, and burning of Ms. Kennedy's car. At trial, co-defendant Chad Williams stated that when Chris Bell first brought up the idea of stealing the car, [defendant] stated "I'm down for whatever." The only evidence that may fit in this category is Dr. Harbin's testimony that the defendant could be easily influenced. Nevertheless, the defendant made a choice to be with his co-defendants during Ms. Kennedy's murder, and actively participated in it. The evidence demonstrated that the defendant was apparently only easily influenced by his friends, but not his family who consistently told him to avoid the codefendants. This demonstrates that the defendant made choices as to whom he would listen.
(footnote omitted).
Defendant argues that both parts of this finding demonstrate that the trial court misapprehended the "peer pressure" mitigating factor. He contends there is no requirement that a defendant demonstrate actual threats or coercion to prove he was subject to peer pressure and that his refusal to listen to his mother after he started hanging out with his codefendant, Bell, was consistent with the existence of peer pressure.
Reading Finding of Fact No. 7 as a whole, it shows that the trial court found that there was little or no pressure exerted by defendant's codefendants to participate in these crimes. The trial court found that when Bell brought up the idea of stealing a vehicle, defendant stated, "I'm down for whatever." It further found that the only evidence that could possibly relate to defendant's susceptibility to familial or peer *681 pressure was Dr. Harbin's testimony that defendant could be easily influenced. However, the trial court nevertheless found that defendant made a deliberate choice to be with his codefendants and "actively participated" in the murder, even that he played an "integral role" in the crime. As for defendant's contention that his refusal to listen to his family members' warnings *412 to stay away from his codefendants is evidence that he was subject to peer pressure, that contention is not supported by the trial court's findings. The trial court found, rather, that this was evidence that he was "apparently only easily influenced by his friends, but not his family ... [which] demonstrates that [he] made choices as to whom he would listen." Defendant's argument is overruled.
H. Finding of Fact No. 8-Likelihood the defendant would benefit from rehabilitation in confinement
8. Likelihood the defendant would benefit from rehabilitation in confinement. The defendant's prison records demonstrate that the defendant has been charged and found responsible for well over 20 infractions while in prison. He consistently refused many efforts to obtain substance abuse treatment. While the defendant has in fact obtained his GED which the court finds is an important step towards rehabilitation, the Court notes that the defendant during the first ten years plus of his confinement often refused multiple case managers [sic] pleas to obtain his G.E.D. According to prison records submitted into evidence during the February 20, 2014 evidentiary hearing, the Court notes that during a 2009 meeting with a psychiatrist the defendant noted that he was depressed in part because he was in prison and should not be. The Court finds that throughout the defendant's life he did not adjust well to whatever environment he was in. The Court finds that in recent years, the defendant has seemed to do somewhat better in prison, which includes being moved to medium custody. Most importantly to this Court, the evidence demonstrates that in prison, the defendant is in a rigid, structured environment, which best serves to help him with his mental health issues, and serves to protect the public from the defendant, who on multiple occasions in non-structured environments committed unlawful acts when in the company of others.
(footnote omitted).
*682 Defendant argues that in making Finding of Fact No. 8, the trial court improperly used his improvement while in prison against him. Contrary to defendant's assertion, Finding of Fact No. 8 indicates that defendant has not benefitted a great deal from rehabilitation during his confinement, which is supported by the trial court's unchallenged evidentiary Finding of Fact No. 3: "The Court finds that the defendant has not been a model prisoner.... His prison records indicate that he has committed and been found responsible for well over 20 infractions since he has been in prison." While the trial court did note that defendant "seemed to do somewhat better in prison" in recent years, it also noted that defendant's own expert testified that his mental health issues made him dangerous and that he would do best in a rigid, structured environment like prison. Accordingly, the trial court's Finding of Fact No. 8 was supported by the evidence and not used improperly against defendant. This argument is overruled.
While Miller states that life without parole would be an uncommon punishment for juvenile offenders, the trial court has apparently determined that defendant is one of those "rare juvenile offenders" for whom it is appropriate. See Miller , 567 U.S. at 479, 132 S.Ct. at 2469, 183 L.Ed.2d at 424. The trial court's unchallenged evidentiary findings combined with its ultimate findings regarding the Miller factors demonstrate that the trial court's determination was the result of a reasoned decision.[4] Therefore, the trial *413 court did not abuse its discretion in weighing the Miller factors to determine defendant's sentence. *683 NO ERROR.
Judge CALABRIA concurs.
Judge STROUD concurs in the result only by separate opinion.

This Court has previously summarized the facts of this case for defendant's direct appeal in State v. Sims , 161 N.C. App. 183, 184-189, 588 S.E.2d 55, 57-60 (2003).

Defendant was tried with Bell and Williams as co-defendants. Williams entered a guilty plea to first-degree murder, first-degree kidnapping, burning personal property, and assault with a deadly weapon inflicting serious injury for his role in Ms. Kennedy's death and testified at trial against defendant and Bell. Williams and defendant were sentenced to life without parole. Bell was sentenced to death upon the jury's recommendation.

We note our Supreme Court's recent opinion in State v. James held that "the relevant statutory language [in N.C.G.S. § 15A-1340.19C(a) ] treats life imprisonment without the possibility of parole and life imprisonment with parole as alternative sentencing options [to be made based on analyzing] all of the relevant facts and circumstances in light of the substantive standard enunciated in Miller ." State v. James , --- N.C. ----, ----, 813 S.E.2d 195, 204 (2018), aff'd , 247 N.C. App. 350, 786 S.E.2d 73 (2016), disc. review allowed , 369 N.C. 537, 796 S.E.2d 789 (2017). But see id. at ----, 813 S.E.2d at 212 (Beasley, J., dissenting) ("A presumptive sentence of life without parole for juveniles sentenced under this statute contradicts Miller .").

Following the Miller ruling, many courts adopted their own interpretation of Miller' s application to current legislation and state practices, as it varies by jurisdictions. More recently, in Malvo v. Mathena , 893 F.3d 265, 274 (4th Cir. 2018), aff'd , Malvo v. Mathena , 254 F.Supp.3d 820 (E.D. Va. 2017), the Fourth Circuit's opinion defined Miller to prohibit "impos[ing] a discretionary life [ ] without [ ] parole sentence on a juvenile homicide offender without first concluding that the offender's 'crimes reflect permanent incorrigibility,' as distinct from the 'transient immaturity of youth.' " Id. (quoting Montgomery , 577 U.S. at ----, 136 S.Ct. at 734, 193 L.Ed.2d at 620 ) (emphasis added).
We rely on our precedent-which Montgomery reiterates-that sentencing judges may consider Miller factors but are not required by law to issue an ultimate finding or conclusion. See Lovette, 233 N.C. App. at 719, 758 S.E.2d at 408 ("The findings of fact must support the trial court's conclusion that defendant should be sentenced to life imprisonment without parole, and a finding of 'irreparable corruption' is not required."); see also Montgomery , 577 U.S. at ----, 136 S.Ct. at 735, 193 L.Ed.2d at 621 ("Miller [does] not require trial courts to make a finding of fact regarding a child's incorrigibility ... this Court is careful [not] to limit the scope of any attendant procedural requirement to avoid intruding more than necessary upon the States' sovereign administration of their criminal justice systems."). We reject the contention that the trial court was erroneous because it did not issue a finding regarding permanent incorrigibility.